Good morning, Your Honor. May it please the Court, my name is Deputy Attorney General Jennifer Weck. I'll be arguing the entire case for the defendants in this matter. The defendants are the Attorney General of California as well as the California Director of the Department of Consumer Affairs. In this appeal, we are requesting that this Court overturn the District Court ruling. The District Court determined that optometrists, medical providers, are similarly situated with interstate optical companies in the sale of eyewear, but they're competitors and therefore the statutes at issue that prohibit the optical companies from having any relationships with doctors, particularly co-locating with doctors on the same premises, is a ‑‑ has a discriminatory effect by allowing doctors to have joint services of eye care and eyewear on their medical ‑‑ in their medical offices while not allowing the interstate RDOs to offer a same type of service. Well, it certainly has a ‑‑ I find this whole thing baffling. It's discriminatory as between optometrists and opticians. And it is probably protectionist legislation that probably doesn't make a lot of sense. But what I need to know is why is it ‑‑ why does this all have to do with interstate discrimination as opposed to discrimination in general? Because that's what the Commerce Clause deals with, right? Correct, Your Honor. In fact, that point is ‑‑ I think it's a critical factor because, you know, as the Court is well aware, discrimination is proper when the entities are, you know, not market competitors or not similarly situated. So it's proper California to discriminate in the sense that they're treating a business entity different from a medical professional per se. But it's also okay to discriminate as long as ‑‑ at least as far as the Dormant Commerce Clause is concerned with regard ‑‑ unless you're discriminating against interstate commerce as opposed to discriminating on some other ground. Correct, Your Honor. And, in fact, this statute doesn't even impact anything, any of the traditional functions or operations of interstate commerce, like the flow of goods and services or treating out of state entities differently. The only sense in which these other entities are interstate or outside the state is the sense that they're headquartered outside the state. Yes, Your Honor. That's sort of fortuitous. They could be headquartered in California. Exactly. Production facilities out of state as well, as I understand. I'm sorry, Your Honor. Production facilities where they manufacture the lenses. Right. Right. The production facility may be located in either location as well. There is no interstate flavor that seems to affect how the statutes operate. So whether you're in or out of state ‑‑ The statute doesn't facially discriminate against out of state. Exactly. That's exactly the point, Your Honor. And in so far as such a discriminatory effect, its effect is ‑‑ it's still not on the market for eyeglasses because, I guess, both the opticians and the optometrists get their stuff from out of state. Or they do or they don't, but whatever they get, it's the same. There's no difference there. Exactly, Your Honor, because there's producers and manufacturers in both locations. So what's making this interstate is simply that these people, that the headquarters of lens crafters is out of state. But it could be in state, but it happens to be out of state. So if you had a California ‑‑ if lens crafters was headquartered in California, would the whole case be different? That's why I have a lot of trouble with it. Yeah, absolutely, Your Honor. They would be then therefore considered in state optical companies. In fact, you know, how the entire statutory structure is designed is that there really isn't an out of state per se optical seller because to sell prescription eyewear in California, you have to be registered in the state before you can even provide that service. So technically, every lens crafter's store is individually registered with the California Medical Board as a registered dispensing optician. And those are the entities that are selling eyewear within the state, regardless of whether or not their headquarters is located in Ohio or Washington or Sacramento. So that really is the only interstate character here. But when you look at all the statutes that are being challenged, kind of the group of the statutes that don't allow for the co‑location, it really has absolutely no impact on anything that you would traditionally see in the numerous interstate commerce cases that this Court has addressed prior to seeing a case like this. I think another point I'd like to raise is that defendants have contended that we're really looking at two completely separate markets. We're looking at, you know, medical providers, health care providers with an emphasis on the visual system who... Well, that doesn't make any sense to me. It's all about eyewear in the end. It's eyewear, and it's eyewear which either is or isn't being sold, so it's convenient to have your eye examined at the same time. But the people who are, from the point of view of people who are participating in the market, what they want is two things. They want eyewear, and they want the eyewear, and they want the examinations. And I don't understand why there's one market for one and one market for another, and maybe insofar as there's not a market for the two together, that's because of the statute. It's completely circular. I'm sorry. I don't understand... And what I mean is the only reason that there isn't a, perhaps, a market that the optometrists and the opticians are in a different market for co-located facilities is because you've made it that way. Oh. Because of the statute. I mean, otherwise, they would be in the same market. It doesn't make any sense. The statutory scheme, you're saying? No, the fact, the notion that they're not similarly situated. The only reason they're not similarly situated is because you've made them not similarly situated. The state law has. Well, we're contending that there's more to it than just that, because really what clients are seeking in this case isn't... If clients truly wanted to co-locate, if that's the purpose behind, you know, what they're seeking in this lawsuit, they have vehicles to co-locate today. They could, as many pharmacies do, locate their optic shops in a medical building with a lot of different doctors. So they've got the huge medical, you know, the optical shop downstairs, and the doctors are in different floors, but there's no interrelationship. So it doesn't raise all the issues the legislature was concerned with, such as, you know, potentially interference, the appearance of impropriety, the deterioration of the doctor-patient trust relationship. So they could do that kind of co-location. There's nothing illegal about being right next door to an optometrist. Additionally, they could operate under the HMO model with another, with an HMO that's not owned by an optical company. They're operating currently with an HMO that's owned by their parent corporation. So they're violating the statutes that way because, again, you've got the relationship... I don't understand why this whole not-similarly-situated argument. Both kinds of entities are trying to do the same thing, which is to operate in a market in which there is an advantage to having not only co-location, perhaps, but control over both entities, which is what the optometrists have. That's what they want to do. You're saying they're not the same because we're not letting them. They're saying they're not allowed to not let you. So it's completely circular. It runs around in circles. You're telling them they can't operate in the market they want to operate in and then saying they're not similarly situated because they're not operating in that market. But the reason they're not operating in the market is because you're not letting them. So I don't understand how that gets you anywhere. Well, they're not allowed to operate in that market because they don't have the same requirements or the same knowledge base, the same educational background. I mean, they're looking at trying to combine with a medical service. But that medical service is being offered by a professional that includes all of these additional requirements that as an optical company, they're not required to have any of those. They don't need a higher education. They don't take an oath to serve the public. They don't provide medical care. They don't have the same expectations. In the end, though, it's all about selling eyewear. In the end, are doctors all about selling eyewear or the optical companies are all about selling eyewear? The opticians, the ultimate end is to provide a prescription for eyeglasses. Yes. Exactly. But they do it in a setting that differs from doctors. Doctors have ethical obligations. They cannot abuse the doctor-patient relationship. Schuster's own point was that the statute restricts that, limits that distinction or provides for that distinction. Within the statutory scheme itself? The statute itself does that. The statute itself does that. In fact, the burdens of those statutes really fall heavily on the doctors. And the design of those statutes is really to promote that professional side of the doctors that is absent on the optical dispensing side by the interstate optical companies. And so, you know. What if we agree with, you know, the district court said that you can compare the two, that they're similarly related. Correct? Correct. Now, if we, let's just move on. If we agreed with that, your next argument is that there's no discriminatory effect. Exactly, Your Honor. And that would be the same argument that I think we started off with, the fact that we're really not seeing that interstate component that you traditionally see in, you know, in these interstate commerce cases. Is that necessary? I think it is necessary. I think, you know, even the Supreme Court said. You're still limiting their market, their ability to compete in the market. They don't have full access to the same market. But they've never taken on the responsibilities to have full access to that market. Right. I mean, so long as he aligns his lawyers and our relationships with paralegal. Can you have out-of-state optometrists operating or, let's see. To be an optometrist, you have to be licensed here. But to be an optician, you also have to be licensed here. Yes. Yeah. But their requirements are like night and day. I mean, I'm not dis- I understand that. But presumably, if you had an optometrist who lived in Nevada but was licensed in California, could he run a place in California? Could he run an optometry practice in California? As long as he's also licensed in California. Right. As long as he's licensed in California. Yeah. Similar as lawyers are, that we can be licensed in different states. So, but, yes, you'd have to be licensed within the state and then, you know, follow the statute that pertained to your profession. And that's kind of a critical distinction defendants have always contended is that, you know, we're not, we're really looking at, you know, because these doctors are professionals, we're really looking at kind of the pinnacle of someone's employment choice. Just to see how the doctrine operates. If we didn't think there was a discriminatory effect, but as Judge Pius says, there's still obviously a sub-burden on the out-of-state opticians. Do we then do a PIKE? Is it PIKE? Is that what you call it? PIKE analysis? Yes, Your Honor, and we do contend that this Court can do a PIKE analysis as the material facts are undisputed, or even taking the facts in light most favorable to plaintiffs. As a matter of law, they're not going to meet the burden to be able, again, to demonstrate that the burdens they've alleged are interstate commerce burdens and let alone that they're clearly excessive compared to the punitive benefits. The district court never reached that issue, correct? Correct, Your Honor. However, defendants contend that the district court did conclude in its discussion regarding discriminatory purpose that it found sufficient evidence to say that the optical companies, which, of course, we contend and we challenge that finding, or that conclusion. Against, I mean, that's why it seems to me that the district court opinion and the briefs to some degree never draw a clear line between discriminatory and discriminatory based on interstate commerce. I mean, it clearly is discriminatory with regard to opticians, but whether it's illegally discriminatory is another question, but it certainly seems to allow optometrists to operate dual function operations. But opticians who hire professionals, i.e., optometrists, and I find it hard to understand why if you think these people are so professional you don't think that they're professional when they're employees as well as when they're not employees. But still, it's discriminatory in that sense, but the question is, is it discriminatory in an interstate commerce sense? And when the district court said it was discriminatory against interstate ‑‑ discriminatory, did he ever say it was discriminatory against interstate commerce as such? I don't recall his exact wording when he was discussing ‑‑ discussing, well, what he said was they discriminate against, I think he uses the phrase out-of-state optical companies. But they happen to be out-of-state optical companies. I'm sorry. They happen to be out-of-state. And that's the difference. They happen to be, but that's not really the nature of what they are in that, again, it goes back to their headquarters in Ohio. The only interstate character that, you know, is involved in this case, it really doesn't seem to be a factor at all to the analysis. Does the law treat the out-of-state optical companies any differently than the in-state optical companies? No, Your Honor. They're treated exactly the same. And, in fact, defendants have contended that the actual entities to compare under Tracy really are the in-state optical companies and the out-of-state optical companies. And when you look at the laws, the law is neutral. It treats them exactly the same. Neither of them can have these various interrelationships with the doctors for the various reasons we've discussed. It's primarily the concern of lay interference. And they're jeopardizing the patient-doctor relationship. How big is the in-state optician market? I believe the statistics showed the in-state, the California market, I believe, 60% are optometrists and 40% are various optical companies. A small percentage, I believe, is ophthalmologists. That's probably a better question for the plaintiffs. But the 40% who are opticians, some of them are these large chains that are headquartered out of state. Some of them are. Probably most of the sales are probably that. And some of them are just local opticians, but that's probably pretty low. Correct. Well, that I don't know the distinction. I don't have any evidence of the percentage of that number. But what I do know is that there's also a percentage of opticians operating within the state that have no affiliation with doctors whatsoever. The only thing they do is sell eyewear, and they're also factored into the California marketplace. And they're covered by the same rules, too. I'm sorry? They're also covered by the same rules. Yes, exactly, Your Honor. Exactly. Did you want to save some time for rebuttal? I do. Thank you. May it please the Court. My name is Lori Schechter, and I represented the plaintiffs in the court below. You are correct, Judge Berzon, that the key question that you do start with is are the entities similarly situated? No, that's not what I said. I want to know what the ‑‑ I don't think that is the key question. It seems to me the key question is where is the effect on interstate commerce here, and is it enough of an effect on interstate commerce that it happens that most of the companies that although they're operating here and are licensed here and are on the ground here are headquartered outside? Does that make them ‑‑ is an effect on them enough to show an effect on interstate commerce? And the answer is yes. The Supreme Court has told us in the Oregon Waste Decision that differential treatment means that in‑state and out‑of‑state economic interests are treated differently where the former is protected at the expense of the latter. That is exactly what we have here. We have ‑‑ And so the whole thing would be entirely different if LensCrafters and 4Eyes and Pearl Vision decided to switch their corporate registration to California Tomorrow. It is no accident that there are only 4 percent, less than 4 percent in the market in California of California optical companies. The statistics that you asked about before are as follows. We know from a study that was done of California in the case that there are only 3.8 percent of opticians in the state of California that are independent California corporations. The chains that are out‑of‑state make up in California only about 26 percent. Nationally, they make up closer to 40 percent. In California, it's much smaller. It is in part because of the laws that erect a barrier. Does it make a difference that there is no discrimination between the local registered opticians and the out‑of‑state? They're treated the same, aren't they? They are treated the same. But the Supreme Court tells us in both the Carbone case, in the Hunt case, the Bacchus case, and a whole host of other cases that a law is no less discriminatory because in‑state entities may happen to be disadvantaged as well. The key question is if all of the entities that compete together, the market competitor test from Tracy, if when you look at all of the entities in the market, and that includes in this case both California optometrists who sell eyewear and the interstate optical companies that sell eyewear, if you look at all of them and you can see that only in‑state entities are favored, that in‑state entities are treated differently than out‑of‑state entities, then you do have what the Supreme Court has defined as discriminatory effect. And the fact that there may also ‑‑ Why are the optometrists in‑state any more than the opticians are in‑state? They both have to be licensed in‑state. Okay? And so the difference is, and if the optometrist lives in Nevada and works in California, he's not treated any differently. So what makes them in‑state, inherently in‑state, any more than the opticians are inherently ‑‑ neither are the ‑‑ as far as I can tell, the optometrists are not inherently in‑state and the opticians are not inherently out‑of‑state. There is no evidence in the record that there is an out‑of‑state entity that can compete in the same way as an optometrist in California. Now, there may well be a Nevada doctor who does that, but if there is, that's really de minimis, because as we saw in the First Circuit case, National Revenue v. Violet, what this statutory scheme does is it reserves a monopoly for the in‑state professionals. In the First Circuit, it was the Rhode Island lawyers, those professionals. And in this case, it's the California optometrists. And it reserves a monopoly for those California entities to offer eyewear in the most competitively advantageous way that there is. It's not just the way that LensCrafters or Eye Care Centers of America wants to do business. It is the way that consumers demand that eyewear be sold. And that is why 90% of the optometrists in the state of California also do sell eyewear. So what is the standard for figuring out when you have a statute that discriminates in effect against interstate commerce? I mean, the concept has obviously been narrowed in other contexts, like an equal protection and so on, of a discriminatory effect. What triggers it? When do we know that there's enough, particularly when you're dealing not with the goods being disadvantaged? Because the goods are both interstate, as far as I can tell, for both entities. The problem is that it's simply a question of where the economic centers are. Well, we know from the Supreme Court case in Baucus that as long as the ‑‑ Which one, I'm sorry? Baucus, B-A-U-C-U-S. We know that as long as there is some competition, that's the Court's word, some competition, between the favored and disfavored entities, then we have a discriminatory effect. But we don't call them favored and disfavored just to stack the deck. I want to know how we know whether they're favored or disfavored to begin with. The way that you know they're favored and disfavored is because the optometrists that sell eyewear in California can do so at the same location where eye exams are offered. The opticians who are out of State cannot. They can be ‑‑ So we just look at what's on the ground, and we don't worry about the fact at all that the fact that the opticians are out of State is just because they happen to be. As far as the State of California is concerned, they don't care if they're in State or ‑‑ I mean, the statute does not in any way focus on whether they're in State or out of State. So whenever the people who own the company are out of State, they are in an advantaged position in terms of challenging State regulations over people who are doing exactly the same thing in State and are covered by the same regulation. That's basically your position. It is, Your Honor, in this regard. There are three types of discrimination that could violate the Commerce Clause, facial, in effect, and purpose. If the statute on its face had language in it that distinguished between in and out of State entities, that would be facial. We do not contend that that is the case here. What we do contend here is that the statutes discriminate in effect. And what that means is that the market for eyewear protects the in‑State entities. It may not protect all in‑State entities, but the only entities that are protected are in State. The only entities that are allowed to sell eyewear at the same location where eye exams are given are in State. And we know from the ‑‑ Well, that's not true either, inherently, as we just talked about. It may be true, again, on the ground, but it's not true inherently. It's certainly true in practice, and the Dormant Commerce Clause does look at the practical effect of the statute. And, again, there's no evidence in the record that there are out-of-State entities. And, in fact, the Attorney General conceded in their interrogatory answer that there is no out-of-State entity that can compete in the same way in this State except for those favored California optometrists. No one out of State can do that. There's been a suggestion that, well, maybe there's an HMO relationship. The Attorney General has taken the position that that relationship is illegal. And that's why, in their interrogatory answers, they said there is no out-of-State entity that can compete in the same way. That is exactly what the Commerce Clause is about. So there's no ability to compete under ‑‑ to set up a one-shop stop under Knox Keene, the Knox Keene Act, after Cole? The California Supreme Court never reached the question, although the question is still out there, as to whether or not the relationship between an optical company leasing space to a Knox Keene plan violates Section 655 and 2556. What the California Supreme Court said is that there's no exemption because it's a Knox Keene plan. It was that exemption that the defendant in that case, Pearl Vision, had been relying on to say that there was no violation. The court below looked at that decision and said that what the California Supreme Court is basically saying is there's a very good chance that these entities cannot compete in this way. And we know that the State official, the Attorney General, says it's illegal. So that would mean the State official could continue to press litigation against optical companies for having an on-site relationship with a Knox Keene plan. So you disagree with the Attorney General that there is a way in which they could compete under Knox Keene? What I disagree with is that there's any evidence in this case that there is a way. They said on the record there is no way that an out-of-State entity could compete in the same way. How about an out-of-State optometrist? They've never raised that argument. And I submit that there may well be a doctor out there who lives somewhere else, gets licensed in California, sets up his business in California, and attempts to one-stop shop. And that may well be legal, but that is de minimis. That is not. That goes to the extent of the discrimination, but not the fact. The case is here we have discriminatory effect in fact. We have the State saying that there's no way an out-of-State entity can compete in the same way. And under the Supreme Court precedent, that is exactly what discriminatory effect is. It's probably no accident that there is less than 4 percent of those in-State companies because, as Your Honor mentioned earlier, there is certainly evidence in this record of a protectionist purpose, which does speak to out-of-State entities and competition from international chains, and that is from interstate chains. And that is exactly what the Dormant Commerce Clause seeks to prevent. It seeks to prevent States from erecting barriers that preclude competition from out-of-the-States. That's what chains present as a threat to the in-State doctors, and that's why these laws were passed. Maybe also the in-State opticians. Maybe the reason why there aren't more in-State opticians is that they can't compete with the out-of-State opticians. That is certainly likely, given that there are less than 4 percent of those entities in the State that are not able to offer one-stop shopping. And because one-stop shopping is the way that consumers demand, it is the most advantageous way to sell. And that is exactly why this fits into the whole line of Supreme Court cases from Carbone and Hunt, Baucus, all of those other cases where, for example, in Hunt, the out-of-State entities were strict of the most competitively advantageous way of selling their apples. That inured to the gun event. So were the in-State ones, too. They were, except for the favorite North Carolina apple growers, who did not want to have to compete with the superior labeling system of the Washington apple growers. And so the law that enacted was not discriminatory on its face, but it most certainly was in effect in the same way that the lower court found that this was. And frankly, the low ---- And in some instances when you're talking about discriminatory effect, and I'm wondering if the State, if the Supreme Court cases go beyond this, they're discriminatory in effect inherently. Essentially, you have disguised facial discrimination, really. I mean, the cases, for example, in which they say you have to have a waste plant within five miles of the city and the city, and there's no way that's out-of-State. I mean, so in fact, they are discriminatory in effect because without saying that you have to be in-State, in fact, you have to be in-State. Now, is that what you're claiming here? Yes. Are you claiming a discriminatory effect of a practical kind? It happens that you can only do it if you're in-State. It doesn't just happen that the California optometrists who are licensed in the State of California to practice in the State of California are conferred a competitive advantage by this statutory scheme when they sell eyewear. It is not ---- But the opticians are also licensed to operate in the State of California and need to be licensed, right? So why aren't you in-State, too? Why aren't you both in-State? We know from the Ninth Circuit decision in Conservation Force v. Manning that the licensing does not create an in-State entity. If it did ---- But you just said it did. That's what you're saying about the optometrists. It's not that they're licensed here that creates their residency. It's the fact that California optometrists in the main are practicing in California because that's where they're licensed and that's where they are resident. It is a residency issue. It is not a licensing issue. But there's no evidence that there are optometrists from other States practicing in the State of California. You're right in the sense that it is a practical response, but there's also no evidence to suggest it's otherwise. And if that were the case, the Dormant Commerce Clause could be evaded entirely by State just creating licensing requirements and then saying everyone is in-State and, therefore, no one could ever challenge it under Commerce Clause grounds. But that is not, in fact, what the law is. What we have here is the same thing that you have in the First Circuit with the Rhode Island law that conferred a monopoly on those professional lawyers. It defined the practice of debt collection as being part of being a lawyer. And in doing so, it conferred a monopoly on what the Court said was largely made up of in-State lawyers. It may well be that there's one lawyer or one optometrist out of the State, but the bottom line is by conferring it on those professionals who practice in that State under their licensing laws, you are conferring a benefit on an in-State entity at the direct expense of out-of-State competition. And that is the definition of discriminatory effect. That expense is really just an increment, correct? It's not an increment in the sense that we know. In the marketplace. That is, they're on the, you know, LensCrafters has stores all over the place. And they're doing business and making money, I suppose, because they're all over. But what you're, I guess, I gather what you're saying is they're not able to compete at the same level as the optometrists who have the advantage of one-stop shopping. They're not able to compete. Now, is that increment sufficient for Commerce Clause purposes? And I would submit that it is. And we know. And what's your best case that supports that notion? I would suggest you look at the Baucus case. In the Baucus case, what we had is out-of-State liquor manufacturers who had to pay a tax that a local liquor manufacturer did not. It was still able to compete. It was still able to sell its wares, but it had to do so at a higher cost. That was discriminatory. I would look at the Hunt case, the Washington apple growers. They were still able to sell in the State of North Carolina, but they had to do it at a less advantageous way. That was a discriminatory effect. I would look at the First Circuit decision as well in the national revenue case. When a law takes away the competitive advantage, in fact, in this case, the way that defines what consumers want, when it gives that right solely to their in-State entities, that is, in fact, discrimination. I would add one other point, because I see my time is up. Go ahead. I have another question for you. Go ahead. Once you determine that there is a discriminatory effect. That was going to be my next question. Terrific. Let me just say, okay, so you apply strict scrutiny, right?  Sure. But, you know, I read the district court's discussion on strict scrutiny analysis, and it looked like he may have engaged in some sort of improper fact-finding. This was summary judgment, correct? It was summary judgment. I don't believe that the district court did, but this Court does not. Is it fair to say at that level, that when his analysis at that point, that all the facts in which he was relying upon were not in dispute? Here's what the district court did. The district court said, I will presume that the State has a legitimate interest, because when strict scrutiny applies, it's a two-part test that the State has to meet. It has to show both a legitimate interest and that there are no nondiscriminatory alternatives to further that interest. The State put on a significant amount of evidence to say they had a legitimate interest, and there were some battles of experts in that area. However, the district court did not base its decision on that ground. It said, I will presume that there is a legitimate interest. Even so, the State has failed to put forth any fact in dispute on the existence of nondiscriminatory alternatives. And in that regard, there was abundant evidence that there were alternative ways that the State could further those interests. Roberts, in summary, shouldn't he have taken that evidence that the State offered in the light most favorable to the State and drawn all inferences in favor of the State? He did. And as you said, they produced a chunk of material. With respect to their legitimate purpose, he did. He said, I assume that you have a purpose for what you've done with these statutes. They gave a laundry list of purposes, and he said, I will assume them all to be true. However, there are other ways to further those interests. And one thing that was quite obvious, there's 46 out of 50 States in this country that have alternative ways of furthering those interests. They do not have a complete ban on the affiliation between optometrists and opticians, as the State of California does. They found alternative routes, alternative means to serve those very same interests. So what the district court did is he accepted all of the arguments and facts that the State put forward. He did not wade into the dispute. He said, I'm going to accept that the State has a legitimate interest. But even so, it's a two-part test. And they put forth nothing on the second part of the test to suggest there was a fact in dispute that there were these alternatives that would serve those means. The final point I would make is, when you're in that strict scrutiny and you get there because of the definition of discriminatory effect, when you are there and you're looking at that very question that Judge Paez raised, you must know that the State has said they do not appeal the finding that these statutes cannot survive strict scrutiny. They did not challenge the non-strict. They don't challenge the legal conclusions. There was no findings here because the district court didn't conduct a trial. It's not findings, but they have said they are not appealing. They're not challenging. They're not challenging. Roberts. They appealed the whole summary judgment. They did, but they expressly say in their brief in opposition to the motion to strike in this Court, after all the briefs were in, they expressly say that they are not challenging the determination that the laws can survive strict scrutiny. And so if the Court finds the entities are similarly situated, that they meet the market treatment of in and out-of-State entities that benefits only in-State entities at the expense of the latter, then we submit. Kagan. It benefits of this. I know I'm continuing to harp on the same issue. Let's assume that even whatever the purpose was, in fact it benefits in-State entities because the optometrists are predominantly or almost all residents, you're saying, in-State. What – and as I understand what you're saying, but who is benefited is not only in-State – who is disadvantaged are both in-State and out-of-State entities. And you're saying that is just per se enough to be a discriminatory effect. It is. And we know that from the Carbone case and the Baucus case, because there they say a law is no less discriminatory because there are some in-State entities that are also disadvantaged. And that makes sense because the test of discriminatory effect is that in-State entities are benefited at the expense of out-of-State entities. And that still happens in this case because even though there are still some, less than 4 percent, but some in-State entities that are disadvantaged. Really what the statutory scheme does is it ensures that the dollars that will flow from the sale of eyewear will all stay in-State if these out-of-State entities are unable to compete on equal footing with the optometrists in the sale of eyewear in the very way that consumers demand. It will shift all the dollars. But there's not – I keep going back to this. The only thing that's out-of-State about these people is where they're headquartered. The goods are the same goods. Both entities are dealing in the same goods. That is true. But you asked earlier whether or not the lower court had addressed this very issue, and, in fact, they had. The lower court addressed the question whether or not this affects commerce at all, and it cites a whole host of cases, including the Supreme Court decision in Lewis v. VT Investments, where the Court said that it is well established that regulations which prevent competition in local markets by out-of-State firms affect interstate commerce just as much as laws regulating the free flow of goods. This is precisely the type of case that the Supreme Court has said discriminates against interstate commerce. Thank you. Thank you. We have a little time for rebuttal, about three minutes. If I may point out, the cases that Ms. Schechter is citing to, the deal with, like the block is import case, is dealing with entities that are true out-of-State entities, shipping goods into the State of Hawaii. Again, we go back to Your Honor's point, which is, what is the interstate player of all of this, and is it just the fact that the State of Hawaii is the state? Or is it just the fact that the headquarters is in a different state? And I think it does all come back to that. That is the only interstate aspect to this. There isn't, you know, the flow of optical goods coming into the state, or I were going out of the state to be manufactured and assembled and then shipped back in, and we're missing that. But moreover, they are in fact operating here in the state, and they're in fact licensed here in the state. The license here in the state, and they're operating within the state, the same as the doctors. Licensed here in the state, operating here in the state, regardless of where they live. So I know one of the points was, you know, is this the case? They're retailers. They make the glasses here, too, I suppose. I mean, they don't make them, but whatever manufacturing they do is done in the state, right? Putting the glasses in the glasses and so on. Right. The assembly of the glasses, of actually, you know, putting the lens and the frame together, can be done in state just as well as it can be done out of state. And there's no evidence to. Is there evidence that the actual, you know, the refraction of the, whatever they do to create the lens, is that done in state as well? There's absolutely no evidence talking about whether the optical suppliers are, you know, somehow hindered because they can't get their goods here, or really, again, the interstate flavor is missing here. What's the best case that supports your point right there? Well, I think Exxon is an excellent case where it really focuses in on the fact that the argument turns on trying to use a preferred business model in the state that the state statutes aren't allowing for, and then trying to use the Commerce Clause to say that, you know, this should be lawful. Strike the statutes down because, yes, it's more convenient for customers to purchase their eyewear in, you know, a single location. And so I think Exxon talks, you know, speaks specifically to this issue in the sense that this really is about trying to use a preferred business model. In fact, even listening to the description of what LensCrafters wants to do is usurp an eye examination, a medical procedure, because it's better for competition in selling eyewear. But this is a medical procedure. This is, you know, this has nothing to do with retail sales of goods, and therefore they're saying, well, we want to be able to have this relationship because we can sell our eyewear. We're more competitive that way. I think another thing that's missing here is that the California legislature has taken into account the fact that there are differing competitive advantages for optical companies and doctors. So there's a lot of professional restrictions on doctors that the optical companies don't share. Kagan. If we were to go to the Pike analysis, I mean, everything we've talked about today is goes to the question of whether we apply a strict scrutiny or a Pike analysis, right? Correct. Suppose we thought you were right about everything else, we went to the Pike analysis. Why would you win at that point? Well, I think we would win on Pike because I think we can show that there's a legitimate public health and safety reason, not only looking at the legislative history, looking at California case law that affirms the legislative history, but also gives examples of where an interrelationship has affected doctors through franchise agreements in the Cato case and through landlord-tenant relationships. In the Drucker case, the United States Supreme Court recognizes the legitimacy of trying to separate healthcare professionals. But, I mean, to me, what's wrong with it, it seems really flimsy, frankly, because the optometrists are doing both and are just as commercially driven. And if you're so there are two possibilities. Either the optometrists are pure, in which case they'll be pure if they are hired by the opticians or share space with the opticians. Or the optometrists are not pure and they are being driven by commercial interests. And I have a very hard time understanding how you can have both models operating at once in a sensible law. Well, I think in looking at the evidence in this case, what we do know is ethical optometrists have a professional oath that says. Okay, and so if they're working for lens crafters, they still have their professional oath and they'll still follow their professional oath. Either one or the other is the case. Either you rely on them professionally or you don't rely on them professionally. And I don't understand. When they're doing exactly the same thing in both instances, because, you see, if the optometrists weren't selling glasses, sure, you'd have to be on much firmer ground. But the optometrists are selling glasses and they're probably predominantly selling glasses. So in terms of having any faith in the purported interest here, frankly, they seem extremely flimsy. Well, I think, you know, we have to go back to the California legislature, which treats all professionals the same way. Yes, but it's very different because there's no other set of doctors that I know of that are also and probably predominantly engaged in selling goods. Well, that is a unique position that optometrists have that's different from a lot of other health care professionals. But when you look at California case law, and I think a beautiful discussion is made in the California Medical Association's amicus brief, where they walk through how all professionals, health care professionals, have some type of business side to their medical operations. Yes, but they're not usually ‑‑ it's not predominant like this and it's not the ‑‑ it's not central in the same way. I mean, doctors don't sell drugs ordinarily. They may prescribe it, but they don't sell it. Correct. And so the whole model makes a lot of sense when you're talking about doctors. It doesn't seem to make a modicum of sense to me when you're talking about optometrists, particularly because the optometrists that you're talking about and who are going to be working for the landscrafters, if they're reliable, then they're still reliable. I don't see why they're less reliable in either instance. Well, I think that there is a distinction of the doctors working for an optical company. Optical company is 100% dependent upon a doctor's prescription. And so there's this inherent motivation. And optometrists are dependent upon somebody fulfilling the prescription and giving people glasses. It's a reciprocal relationship. Well, if an optometrist is dispensing in his medical office, that doctor's license and that doctor is responsible for everything that falls ‑‑ every patient care that's given in his medical office. Can optometrists employ opticians? Yes, they can. Okay, but opticians can't employ optometrists. Exactly, Your Honor. But the other issue that's really critical is the doctor that would be working inside a landscrafter's store, they're working for an employer or they're co‑located with some landlord‑tenant relationship that's authoritative over them. And with that entity's goal is to get them to sell more eyewear. I mean, they're totally dependent on the doctor writing those prescriptions. But the optometrists are also interested in selling eyewear. That's why they sell eyewear. Yes, but they've got a professional oath to never let the sale of eyewear become a predominant factor. And so do the other optometrists. It's really mystifying to me. The whole thing makes no sense. The optometrists either are reliable professionally or they're not reliable professionally. And in either instances, they have the same commercial pressures applying to them, and they either succumb to them or they don't. I absolutely don't see it. It makes no sense to me on a PIKE basis. The California legislature, I think, was in the best position to make that determination as to even optometrists with the best interests may feel the pressures of a lay entity to do things that normally they wouldn't. If we were to determine that a PIKE analysis were required, you wouldn't have any objections to sending it back to the district court to conduct that analysis, would you? Obviously, we're requesting that this Court do it. We believe that the facts are undisputed or taken in light of plans that they don't meet their – as a matter of law, they don't meet their burden. And so we contend that this Court could do it. But it's – yes, it could go back to the district court. Thank you. One question. Just in order to understand our posture in the case, do you agree with opposing counsel that if we were to reach a strict scrutiny that you have no defense to that? Your Honor, we've always said that we have challenged the district court's factual findings. I mean, the court basically decided that optometrists wear two hats, and one is a retail seller and one is a medical provider. We've contended that the court has no evidence of that. In fact, the evidence shows, contrary to that, that the doctor remains a doctor. I'm not sure you're answering my question. If we get to strict scrutiny, do you concede that you would lose on that because you haven't said anything? We haven't challenged that legal finding, but we have challenged because of that court's narrow decision that we – that they wear two hats, that actually impacts everything else the district court judge did, including factual finding, and we make that challenge. So the answer is yes? Yes to the factual issues that would come into play under Plank and would come into play under Tracy, but not the legal analysis of the district court for it. Well, I'm not sure what I've gotten here. If we get to strict scrutiny at that point, the other – your opposition says you've presented nothing that would contradict or be able to overcome the strict scrutiny requirements, and therefore, you would concede if we reach that point. And I know you don't want to get to that point, but if we were to, just so I understand our posture, that's your position? We have not raised a legal challenge to that yet, Your Honor. Okay. Thanks. Thank you. We appreciate your argument. It's a very interesting case. The matter will be submitted, and that ends our session for the day. Thank you.
judges: Hug, Paez, Berzon